UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE HANOVER INSURANCE GROUP,<br>Plaintiff<br><br>v.<br><br>ANTHONY F. ROSCITI, JR.; HENRY V. ROSCITI; SHANNON B. ROSCITI; and A.H.R. UTILITY CORPORATION,<br>Defendants | CIVIL ACTION NO. 06-276/T |
| ANTHONY F. ROSCITI, JR.; and SHANNON B. ROSCITI,<br>Plaintiffs<br><br>v.<br><br>THE HANOVER INSURANCE GROUP,<br>Defendants | CIVIL ACTION NO. 06-392/T |

**PRETRIAL STATEMENT OF THE HANOVER INSURANCE GROUP**

The plaintiff, The Hanover Insurance Group ("Hanover"), by and through counsel, hereby submits this pretrial statement pursuant to Federal Rule of Civil Procedure 16 and the Notice of this Court dated July 25, 2007.

**Facts**

South Shore Utility Contractors, Inc. ("South Shore") is a utility contractor doing, among other things, public jobs requiring surety bonds in Rhode Island. South Shore came to Hanover in early 2005 seeking surety bonds.

As partial consideration for Hanover agreeing to its extend credit in the form of writing bonds on behalf of South Shore, Indemnitors and defendants Anthony F. Rosciti, Jr., and

Shannon B. Rosciti (collectively, as "Roscitis"), Henry V. Rosciti ("Henry Rosciti"), AHR Utility Corporation ("AHR"), and South Shore executed an Agreement of Indemnity dated May 31, 2005 ("Indemnity Agreement"). Among other things, the Indemnitors agreed, jointly and severally, to:

1. Indemnify and hold harmless Hanover from all loss, costs, attorneys' fees, interest, etc., occasioned by its having written bonds on behalf of South Shore (Paragraph 2);

2. Post cash collateral with Hanover when liability existed or was asserted against Hanover under the bonds in an amount satisfactory to Hanover (Paragraph 3);

3. Reimburse Hanover for all amounts it pays under the bonds on its "belief that liability for the payments existed or that payment was necessary or expedient, whether or not such liability necessity or expediency existed. Vouchers or other evidence of payment by the Surety shall be conclusive evidence of the fact and amount of such liability, necessity, or expediency and of the Indemnitors' liability to the Surety therefor" (Paragraph 3);

4. Assign all right and title to bonded and unbonded contract proceeds to Hanover, and enforceable when Indemnitors, or any one of them, are in default of the Indemnity Agreement (Paragraphs 5, 6); and

5. Covenant and agree that all bonded contract funds are held in trust for payment of bonded obligations on bonded construction jobs (Paragraph 7).

Violation of any of these promises or covenants by any Indemnitor constituted a material default of the Indemnity Agreement. The Indemnity Agreement is attached to this Pretrial Statement as Exhibit 1.

In reliance of these promises, Hanover wrote performance and payment bonds on behalf of South Shore on two projects. Hanover wrote a total of five bonds on a project known as the Pawtucket Water Treatment Facility ("Pawtucket Project") totaling $7,640,000. These bonds, subject to their terms and conditions, obligated South Shore, as principal, and Hanover, as surety, to complete the project pursuant to the underlying contract and pay all labor and material suppliers. The bond was written in favor of the two obligees, O. Ahlborg, Inc. and Earth Tech, Inc.

Hanover also wrote performance and payment bonds on an Amtrak Project in Pawtucket Rhode Island ("Amtrak Project") in the amount of $365,900. Again, South Shore, as principal, and Hanover, as surety, generally obligated themselves to perform the work under the underlying contract and pay claimants which had supplied labor or material to South Shore on the project. The bond was written in favor of Amtrak, as obligee.

Although there are still pending claims, Hanover expects to suffer losses and expenses in excess of $2.5 million under the bonds for these two projects, net of remaining contract funds on each.

Hanover began receiving claim notices under the above payment and performance bonds beginning in November of 2005. Specifically, Hanover received claims from one subcontractor and from one material supplier on the Pawtucket Project totaling $1.3 million. At least one claimant alleged that South Shore had received contract funds for their work from the obligees on the bonds, but had not paid these funds over to the claimant for the accepted work and/or materials. The obligees on the Pawtucket Project confirmed to Hanover that they, indeed, had paid South Shore for labor and material relating to this claim, and looked to Hanover to resolve both payment bond claims.

By letter dated March 17, 2006, and pursuant to the terms of the Indemnity Agreement, Hanover made a demand for collateral in the amount of $1.3 million against all Indemnitors. The Indemnitors refused to post collateral with Hanover. By letters dated March 21, 2006, pursuant to its rights under the Indemnity Agreement, Hanover wrote to the obligees on the Pawtucket and Amtrak Projects and asked each not to pay any additional contract funds to South Shore without Hanover's prior, written consent.

By letter dated April 13, 2006, from the Indemnitors to Hanover, the Indemnitors each acknowledged that they were presently financially unable to perform their obligations under the relevant contracts and bonds and were in default of their obligations under the bond and Indemnity Agreement. The Indemnitors expressly reaffirmed their joint and several obligations under the Indemnity Agreement. In addition, by letters also dated April 13, 2006, South Shore wrote to the obligees on the above projects and irrevocably and voluntarily terminated their construction contracts with each effective upon receipt of the letters. Further, South Shore irrevocably directed all payments due or to become due under the contracts be made payable solely at the direction of Hanover. In addition, South Shore abandoned each of these projects on or about April 7, 2006.

Over the course of the months between April and June 2006, Hanover worked to re-let the Pawtucket Project to a completing contractor by tendering the contractor directly to the obligee under the performance bond. During this same period of time, Hanover arranged for the completion of the Amtrak Project. Finally, Hanover has paid subcontractors and material suppliers on both jobs.

On or about May 12, 2006, Anthony Rosciti filed a petition in Rhode Island Superior Court placing South Shore in receivership. Jonathan Savage, Esq., was appointed permanent receiver on or about June 5, 2006.

**Procedural Posture**

On June 12, 2006, Hanover initiated an indemnity action in this Court (Civil Action No.: 1:06-cv-00276) against the Roscitis, Henry Rosciti and AHR as joint and several obligors under the Indemnity Agreement ("Hanover Action"). On August 1, 2006, the Roscitis filed a separate action in Rhode Island Superior Court ("Rosciti Action"). Hanover removed this action by its Notice dated August 30, 2006 and, by Order dated January 4, 2007, this Court denied the

separate motions of the Roscitis and South Shore, through its receiver, to remand and dismissed Henry Rosciti, AHR and South Shore, through the receiver, as party defendants to the Rosciti Action.

Hanover filed a motion on September 15, 2006, to consolidate the Hanover Action and Rosciti Action, which motion was granted by this Court's Order dated October 11, 2006. Defendants Henry Rosciti and AHR filed an Answer to the Hanover complaint on September 5, 2006. Defendants Roscitis, filed its answer and counterclaim to the Hanover Action on December 11, 2006. The counterclaim parrots the complaint filed by the Roscitis in the Rosciti Action.

**Statement of Claim**

The Hanover Action against these Indemnitors is simply a suit to enforce the obligations under the Agreement of Indemnity which each Indemintor executed on behalf of Hanover as a condition to Hanover writing bonds on behalf of South Shore. Principally, Hanover seeks to enforce the clear reimbursement obligation of defendants for amounts Hanover has paid under the bonds and as expense. Or, as the First Circuit Court of Appeals has concisely stated the obligation when considering the same indemnity language as the Hanover Indemnity Agreement, "If we pay, you pay." *Constructora Andrade Gutierrez v. Am. Int'l Ins Co.*, 467 F.3d 38, 46 (2006).

Pursuant to its obligations under the performance and payment bonds that it issued on the two projects described above, Hanover has paid to date a total of $ 1,633,935.08 on various performance and payment bond claims. The Indemnitors are duty bound by the Indemnity Agreement to repay these amounts to Hanover, along with attorney/consultant fees (to date, total approximately $175,000) and interest. There are additional claims pending which total

approximately $750,000. The Indemnitors are duty bound to Hanover to secure it from further loss on these claims by posting sufficient collateral. The Indemnitors has refused to do either.

By letter dated March 17, 2006, after Hanover received claims from labor and material suppliers of South Shore, Hanover, made a demand for collateral upon the Indemnitors. The Indemnitors refused to post collateral with Hanover. By letter dated April 13, 2006, to Hanover, the Indemnitors acknowledged that they were "financially unable to perform their obligations under contracts and/or bonds and are in default under the bonds and Agreement of Indemnity." As such, the Indemnitors were in default of the Indemnity Agreement when they refused to post collateral and generally acknowledged their default under the Agreement by their letter dated April 13, 2006. By letters dated March 21, 2006, Hanover wrote to the obligees on the Pawtucket Project and the Amtrak Project and asked each not to pay any additional contract funds to South Shore without Hanover's prior written consent.

The Roscitis, in their counterclaim in the Hanover Action and in their complaint in the Rosciti Action, which counterclaim and complaint are identical, complain that they had disputes with unnamed subcontractors on the Pawtucket Project and the Amtrak Project. Despite notice of these disputes, they allege Hanover wrongfully wrote to the obligees to stop payment of contract funds to South Shore. This sole complaint forms the basis of the various causes of action stated by the Roscitis as breach of contract, tortious interference with contract, tortious interference with prospective business advantage, bad faith, breach of fiduciary duty, and unfair and deceptive acts and practices under M.G.L. c. 93A. The Roscitis allege that their damages either offset or are greater than the amount Hanover paid under the two bonds.

Defendants Henry Rosciti and AHR filed an Answer in the Hanover Action generally denying the Hanover claims.

Hanover claims that, under Rhode Island Law, these defenses or causes of action to offset Hanover's claim are not recognized. As detailed above, the Agreement of Indemnity provides Hanover wide latitude and discretion in resolving claims under the payment and performance bonds. As stated, the Agreement of Indemnity allowed Hanover to resolve the claims under the bonds through payment whether or not South Shore and the Indemnitors had any disputes against the claims. In fact, the Agreement provides that "the Indemnitors agreed to immediately reimburse the Surety for any and all payments and disbursements made . . . under the Surety's belief that liability for the payments existed or that payment was necessary or expedient, whether or not such liability, necessity or expediency existed."

This indemnity same language has been construed both by the Rhode Island Supreme Court in *Massachusetts Bonding and Insurance Company v. Gautieri*, 30A 2d 848 (R.I. 1943), and by a First Circuit Court of Appeals in *Fireman's Ins. Co. of Newark, N.J. v. Todesca Equip. Co.*, 310 F. 3d 32 (1st Cir. 2002). In the *Fireman's Insurance* case, the First Circuit Court of Appeals reaffirmed the holding in *Massachusetts Bonding* as still the current law in Rhode Island:

> "When a Surety brings an action pursuant to an Indemnity Agreement giving the Surety broad discretion to pay claims, the only defense an Indemnitor can raise is that the Surety committed fraud or collusion in paying the claim."[1]
>
> *Fireman's Insurance*, 310 F.3d at 35.

---

[1] In both the Massachusetts Bonding and Fireman's Insurance cases, the Indemnity language under consideration parrots the language cited above in the Hanover Indemnity Agreement; namely, "the Indemnitors agreed to immediately reimburse the Surety for any and all payments and disbursements made . . . under the Surety's belief that liability for the payments existed or that payment was necessary or expedient, whether or not such liability, necessity or expediency existed."

In both the *Massachusetts Bonding* and *Fireman's Insurance* cases, the Indemnitors argued, in construing the indemnity agreements, that Rhode Island's common law principle that all contracts contain an implicit covenant of good faith and fair dealing should apply. Both courts specifically rejected this argument. As stated in the *Fireman's Insurance* case:

> "The court in Massachusetts Bonding considered the precise question of whether the strict language of the Indemnity Agreement preempted the common law rule that contracts contain an implied covenant of good faith and fair dealing. The court concluded that the common law covenants were inapplicable given the stringent language of the Indemnity Agreement... [The Indemnitors] must live by the terms of their agreement, which entitle [the Surety] to repayment of all claims paid by it in the absence of fraud or collusion."
>
> *Fireman's Insurance*, 310 F.3d at 37.

In either its counterclaim and complaint, the Roscitis make no allegation that Hanover engaged in fraud or collusion with either of the owners in resolving and paying the claims presented under the performance and payment bonds. The Roscitis only complain that Hanover was wrong in contacting the owners to stop the flow of contract funds to South Shore after Hanover became aware of at least $1.3 million in claims against the payment bonds on the Pawtucket Project, and after the Indemnitors refused to post collateral as Hanover had requested and as required under the Indemnity Agreement. Otherwise, the Roscitis make only conclusory statements that Hanover engaged in wrongful conduct, but do not explain how or why it was wrongful. Consequently, the Roscitis have not supplied any basis for defense of the Hanover indemnity claim recognizable under Rhode Island law and, therefore, all counts contained in its counterclaim and complaint should be dismissed. Further, defendants Henry Rosciti and AHR have not alleged any defense to Hanover's Action based in fraud or collusion. Consequently, Hanover plans to file a summary judgment motion before this Court in the next few weeks.

In conclusion, Hanover asserts that it is clear from the Indemnity Agreement that the Roscitis, Henry Rosciti and AHR owe Hanover reimbursement for its losses and expenses under the performance and payment bonds provided South Shore on the Pawtucket and Amtrak projects. The defendants have asserted no defense to this indemnity action recognized under Rhode Island law. Consequently, this action is one to collect on a debt and, once Hanover has provided vouchers evidencing the payments made, the both fact of the defendants' liability and the amount of their liability should be deemed proved.

Respectfully submitted,
THE HANOVER INSURANCE GROUP,
By its attorneys,

*/s/ Ronald E. Ritland*

Kevin C. Cain, Esq., (#3960)
John P. Connelly, Esq.
Ronald E. Ritland, Esq.
Peabody & Arnold, LLP
30 Rowes Wharf
Boston, MA 02110
(617) 951-2100

Dated: August 21, 2007

**CERTIFICATE OF SERVICE**

I, Ronald E. Ritland, hereby certify that on this 21st day of August 2007, the foregoing document was filed through the ECF System and will be sent electronically to the registered participants in this case and sent via first class mail to the non-registered participants, as identified on the Notice of Electronic Filing.

*/s/ Ronald E. Ritland*
Ronald E. Ritland

666648