UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF RHODE ISLAND

THE HANOVER INSURANCE GROUP,
Plaintiff,

v.

CIVIL ACTION
NO. 1: 06-cv-0276-T-LDA

ANTHONY F. ROSCITI, JR., SHANNON B. ROSCITI, HENRY V. ROSCITI, JR. and AHR UTILITY CORPORATION,
Defendants.

**RESPONSES OF DEFENDANT HENRY ROSCITI AND AHR UTILITY TO PLAINTIFF'S REQUEST FOR ADMISSIONS AND FIRST SET OF INTERROGATORIES TO DEFENDANT HENRY V. ROSCITI, JR. and AHR UTILITY CORPORATION**

NOW COMES Defendants, Henry V. Rosciti, Jr. ("Rosciti") and AHR Utility Corporation ("AHR") (collectively the "Defendants"), pursuant to Rules 33 and 36, respectively, of the Federal Rules of Civil Procedure, and hereby amends their answers in response to Plaintiff, The Hanover Insurance Group's ("Hanover") request for more responsive answers to the below Requests and Interrogatories as follows:

**AMENDED RESPONSES TO REQUESTS FOR MORE RESPONSIVE ANSWERS**

**Admission No. 5**

South Shore Utility Corporation, Inc. ("South Shore") did not resolve the claims submitted by G. Donaldson by making payment to G. Donaldson as set forth in the letter from South Shore's attorney to the attorney for G. Donaldson dated March 22, 2006 and proposed Judgment Stipulation, both of which are attached to these Requests and Interrogatories as Exhibit 1.

**RESPONSE No. 5**

Unable to Admit or Deny.

**AMENDED RESPONSE No. 5**

Admitted only to the extent that South Shore was prevented from making **all** of the payments to G. Donaldson pursuant to the aforementioned agreement solely because of interference from Hanover, but to the knowledge and belief of Rosciti and AHR a $100,000 payment was made to G. Donaldson as the initial payment in satisfaction of the agreement with G. Donaldson.

**Interrogatory No. 5**

If the request for admission is denied, please state in detail the manner in which South Shore resolved the G. Donaldson claim including but not limited to:

1. Details of all communications Rosciti, AHL and/or South Shore had with G. Donaldson concerning resolution.

2. Terms of the agreement between the parties that constituted its resolution.

3. Terms of payment by South Shore to G. Donaldson to resolve the claim.

4. Details of all payments made by South Shore or any other party to G. Donaldson to resolve its claim including check number, date of check, amount of check.

**ANSWER No. 5**

Objection in that this interrogatory asks for information pertaining to transactions between South Shore and G. Donaldson to which Rosciti and AHR were not parties and would call for speculation on the part of Rosciti and AHR. Without waiving said objection, Rosciti and AHR aver that they were not involved with the dealings between South Shore and G. Donaldson regarding the matter referred to in Request for Admission No. 5 and Interrogatory No. 5 so as to be in a position to admit or deny Request for Admission No. 5 or provide the information requested in Interrogatory No. 5.

Furthermore, without waiving said objection, Mr Anthony Rosciti, President of South Shore and AHR, avers that a settlement acceptable to G. Donaldson was negotiated through South Shore's counsel and Mr. Jerry Visconti of G. Donaldson, and the terms of which are in the possession of South Shore.

**AMENDED ANSWER No. 5**

On or about March 22, 2005, a settlement acceptable to G. Donaldson was negotiated through South Shore's counsel, Mr. Joseph Ferrucci, and Mr. Jerry Visconti of G. Donaldson, whereby South Shore agreed to pay G. Donaldson $100,000 upon execution of the settlement agreement, $100,000 within thirty (30) days thereafter and the balance within another thirty (30) days. Shortly after the settlement agreement was negotiated, Hanover interceded with the owners of the Pawtucket and Amtrak projects and stopped all income to South Shore which prevented South Shore from making payments to G. Donaldson as agreed. It is the belief of Rosciti and AHR that a $100,000 payment was made to G. Donaldson as the first payment in accordance with the settlement agreement and had Hanover not interfered with the flow of payments from the Pawtucket and Amtrak projects, South Shore would have made the remaining payments to G. Donaldson as agreed. Records of the $100,000 payment are in the hands of South Shore's receiver and Rosciti and AHR have no detailed information regarding the check number and date, but said information will be found in those records. Therefore, South Shore had settled its dispute with G. Donaldson by negotiating a settlement, agreeing to terms of payment and making the initial $100,000 payment as required; however, it was prevented from making any further payments to G. Donaldson pursuant to the terms negotiated between the parties when Hanover intervened and stopped all income to South Shore rendering it incapable of making payments to G. Donaldson as agreed.

**Admission No. 6**

Despite receiving payments from the general contractor on the Pawtucket Project for labor and/or materials supplied to the Pawtucket Project by G. Donaldson pursuant to a contract with South Shore, South Shore did not make any payments to G. Donaldson from payments received.

**RESPONSE No. 6**

Unable to admit or deny.

**AMENDED RESPONSE No. 6**

Denied.

**Interrogatory No. 6**

If the request for admission is denied, set forth in detail the basis for the denial, including but not limited to detailing all payments made by South Shore to G. Donaldson by check number, date, amount and date delivered to G. Donaldson.

**ANSWER No. 6**

Objection in that this interrogatory asks for information pertaining to transactions between South Shore and G. Donaldson to which Rosciti and AHR were not parties and would call for speculation on the part of Rosciti and AHR. Without waiving said objection, while Rosciti and AHR were not involved with the negotiations between South Shore and G. Donaldson regarding the matter referred to in this Request and Interrogatory, based upon information and belief of Rosciti and AHR, any information and documents regarding dealings with G. Donaldson regarding the matter referred to in Request for Admission No. 6 and Interrogatory No. 6 would be within the knowledge and possession of South Shore and counsel for Mr. A. Rosciti. Furthermore, without waiving said objection, AHR avers through its President, Mr. A. Rosciti that partial payments were made to G.

Donaldson and that there was a dispute as to the remaining payments due. AHR avers that the details of said transactions are in possession of South Shore.

**AMENDED ANSWER No. 6**

Rosciti and AHR aver that there was a dispute regarding the amount owed G. Donaldson that resulted in South Shore withholding payment from G. Donaldson until the dispute was resolved. Upon resolution of the dispute and the negotiation of a settlement with G. Donaldson, South Shore agreed to make certain payments to G. Donaldson as outlined in Amended Answer 5, and made the initial $100,000 payment as agreed, but before any further payments could be made, Hanover interceded and stopped all income to South Shore, which rendered it incapable of making said payments to G. Donaldson as agreed. Furthermore, Rosciti and AHR reassert their Amended Answer to Interrogatory 5 as part of their amended response to Interrogatory 6.

**Admission No. 7**

Under the terms of the Agreement of Indemnity, Rosciti and AHR had a duty to post collateral in response to Hanover's demand (Exhibit B to Hanover's Complaint).

**RESPONSE 7**

Objection, calls for a legal conclusion which Rosciti and AHR are not qualified to give. Additionally, the terms and conditions of the so-called Indemnity Agreement appended to Hanover's Complaint as Exhibit A speak for themselves.

**AMENDED RESPONSE 7**

Rosciti and AHR can neither admit or deny that they had a "duty" as the term is a legal term of art with which they are unfamiliar and the term was not defined by Hanover. Notwithstanding,

Rosciti and AHR admit that the Indemnity Agreement states, "Payment shall be made to the Surety by the indemnitors as soon as liability exists or is asserted against the Surety." Additionally, Rosciti and AHR admit that they did not post said collateral in response to Hanover's demand.

**Interrogatory No. 7**

If the request for admission is denied, please set forth in detail the basis for the denial.

**ANSWER 7**

No Answer required.

**Admission No. 8**

The failure of Rosciti and AHR to post collateral and/or otherwise indemnify Hanover constituted their default of the Agreement of Indemnity.

**RESPONSE 8**

Denied.

**AMENDED RESPONSE 8**

Rosciti and AHR can neither admit or deny they were in "default" of the Agreement of Indemnity, as "default" is a legal term of art with which they are unfamiliar and the term was not defined by Hanover. Notwithstanding, Rosciti and AHR admit they did not post collateral as alleged in Request for Admission No. 8.

**Interrogatory No. 8**

If the request for admission is denied, please explain in detail the basis for the denial and, specifically, why Rosciti and AHR signed the letter acknowledging default, attached to the Complaint of Hanover as Exhibit C.

**ANSWER 8**

Rosciti and AHR aver that they were attempting to raise funds sufficient to post collateral requested by Hanover, but Hanover caused owners of both the Pawtucket Project and Amtrak Project to cease all payments to South Shore which severely impacted the ability of Rosciti and AHR to secure necessary collateral. Furthermore, Rosciti and AHR signed the letters only after Hanover promised to allow Rosciti Construction to complete the projects and minimize the exposure and risk to Hanover.

**AMENDED ANSWER 8**

None required.

**Admission No. 9**

In resolving claims under the payment and performance bonds for the Pawtucket and Amtrak Projects, Hanover did not engage in fraud or collusion with either the owners or obligees on these respective Projects.

**RESPONSE 9**

Objection, calls for a legal conclusion which Rosciti and AHR are not qualified to give. Furthermore, the Defendants are unable to admit or deny because discovery to lead evidence required to prove fraud or collusion is still ongoing.

**AMENDED RESPONSE 9**

Denied

**Interrogatory No. 9**

If the request for admission is denied, please set forth in detail the facts supporting Rosciti and AHR's claim that Hanover engaged in fraud or collusion with the obligees or owners in resolving the payment and performance bond claims on the Pawtucket and Amtrak Projects.

**ANSWER 9**

Rosciti and AHR aver that they are unable to admit or deny this request since discovery is still ongoing and depositions which would reveal the information requested have not yet been obtained.

**AMENDED ANSWER 9**

Rosciti and AHR aver that Hanover contacted with the owners of both projects to settle claims under the construction bond and made the cessation of any and all future payments to South Shore a condition for said payments made by Hanover under its bond obligation. Both Hanover and the owners of the projects knew or should have known that cutting off all of the income to South Shore would cause it to become unable to pay its debts as they came due. Rosciti and AHR maintain that under the terms of the Agreement of Indemnity, while Hanover had a right to make payment to satisfy claims under the bond, it did not have the right to stop all income to South Shore, which it knew or should have known would cause South Shore to be unable to pay any of its debts as they came due.

**Admission No. 10**

Hanover's claims are not barred by its own breach of contract, to wit: the Agreement of Indemnity as set forth as Affirmative Defense No. 5 in the Amended Answer of Rosciti and AHR to the Complaint of Hanover.

**RESPONSE 10**

Denied.

**Interrogatory No. 10**

If the request for admission is denied, please set forth in detail the basis for the denial, including all facts supporting Rosciti and AHR's claim that Hanover breached the Indemnity Agreement.

**ANSWER 10**

Objection, calls for conclusions of law and information subject to work product privilege. Without waiving said objection, Rosciti and AHR aver that Hanover breached its agreement with South Shore when it caused all income to South Shore to cease, which caused South Shore to be unable to fulfill its obligations. Rosciti and AHR maintain that had Hanover not forced South Shore into insolvency, South Shore would have been able to satisfy its obligation under the Indemnity Contract.

**AMENDED ANSWER 10**

Rosciti and AHR maintain that Hanover breached its agreement with South Shore when it caused all income to South Shore to cease, which caused South Shore to be unable to fulfill its obligations. Rosciti and AHR maintain that the Agreement of Indemnity only granted Hanover, "the exclusive right to adjust, settle, or compromise any claim, demand, suit or any other proceeding

arising out of any bond against the Surety," but it did not authorize it to cause all income to South Shore to be cut off, which it knew or should have known would force South Shore to become insolvent to the extreme prejudice of the indemnitors. Hanover's actions in cutting off all sources of income to South Shore, thereby rendering it insolvent, constituted a breach of the Agreement of Indemnity. Had Hanover not interfered with the flow of income to South Shore, South Shore would have been able to satisfy its obligation under the Agreement of Indemnity and the indemnitors would not be in the current position. Hanover's actions constitute a breach of the Agreement of Indemnity. These actions changed the contractual bargain to which the indemnitors agreed under the Agreement of Indemnity in that they did not agree to indemnify Hanover in the event that Hanover itself caused the inability of South Shore to pay its obligations to Hanover or to the owners of the Pawtucket Project and the Amtrak Project.

**Admission No. 11**

Hanover's claims are not barred by its own misfeasance and/or malfeasance, as alleged by Rosciti and AHR in their Affirmative Defense no. 6 to the Hanover Complaint.

**RESPONSE 11**

Denied.

**Interrogatory No. 11**

If the request for admission is denied, please set forth in detail the basis for the denial, including all facts supporting Rosciti's and AHR's claim that Hanover engaged in misfeasance or malfeasance in this matter.

**ANSWER 11**

Objection, calls for legal conclusion and information subject to work product privilege. Without waiving said objection, Hanover contacted the owners of the Pawtucket Project and the Amtrak Project and instructed them to make no further payments to South Shore. With all income from both projects cut off, South Shore was unable to continue to meet its contractual obligations, including but not limited to satisfying the construction bond with Hanover. Had income to South Shore not been stopped by Hanover, South Shore avers that it would have been able to satisfy its obligation on the construction bond and the indemnitors would not have been placed in the position of being asked to satisfy the Indemnity Contract.

**AMENDED ANSWER 11**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10 is reasserted herein. Rosciti and AHR maintain that all of their defenses are based upon the same operative set of facts whereby Hanover contacted the owners of the Pawtucket Project and the Amtrak Project and instructed them to make no further payments to South Shore, thereby forcing South Shore to become insolvent. With all income from the only two projects it had cut off, South Shore was unable to continue to meet its contractual obligations, including but not limited to satisfying the construction bond with Hanover. Hanover knew or should have known that cutting off all of South Shore's stream of income would cause South Shore to become insolvent, but acted with malfeasance or misfeasance in demanding the owners of the Pawtucket Project and Amtrak Project stop all payments to South Shore, to the extreme prejudice of the indemnitors. Had income to South Shore not been stopped by Hanover, Rosciti and AHR aver that South Shore would have been able to satisfy its obligation on the construction bond and the indemnitors would not have been

placed in the position of being asked to satisfy the Agreement of Indemnity. Rosciti and AHR aver that the actions of Hanover, which were outside of their authority under the Agreement of Indemnity, constituted malfeasance and/or misfeasance in that it knew or should have known that its actions would cause South Shore to become insolvent, which was prejudicial to the indemnitors. These actions changed the nature of contractual bargain to which the indemnitors agreed under the Agreement of Indemnity in that they did not agree to indemnify Hanover in the event that Hanover itself caused the inability of South Shore to pay its obligations to Hanover or to the owners of the Pawtucket Project and the Amtrak Project.

**Admission No. 12**

Hanover's claims are not barred insofar as they were caused through its own negligence, as set forth in Affirmative Defense No. 7 in the Amended Answer filed by Rosciti and AHR.

**RESPONSE 12**

Denied.

**Interrogatory No. 12**

If the request for admission is denied, please set forth in detail the basis for the denial, including all facts supporting Rosciti and AHR's claim that Hanover was negligent.

**ANSWER 12**

Objection, calls for a legal conclusion and disclosure of information subject to the work product privilege. Without waiving said objection, see Answer 10 and Answer 11.

**AMENDED ANSWER 12**

Rosciti and AHR maintain that the same operative set of facts as set forth in Amended Answers 10 and 11, and reasserts them in response to Interrogatory 12. Rosciti and AHR aver that in cutting off all income to South Shore Hanover caused South Shore to become insolvent. In the event that Hanover is found not to have intentionally caused South Shore to become insolvent, it alternatively acted in such a matter that was negligent in that it knew or should have known that its actions in cutting off all income to South Shore would cause it to become insolvent to the prejudice of the indemnitors. Hanover's actions changed the contractual bargain to which the indemnitors agreed under the Agreement of Indemnity in that they did not agree to indemnify Hanover in the event that Hanover itself caused the inability of South Shore to pay its obligations to Hanover or to the owners of the Pawtucket Project and the Amtrak Project and said actions constituted negligence on the part of Hanover.

**Admission No. 13**

Hanover's claims are not barred by its tortious interference with prospective business relations as alleged in Affirmative Defense No. 8 of the Amended Answer filed by Rosciti and AHR.

**RESPONSE 13**

Denied.

**Interrogatory No. 13**

If the request for admission is denied, please set forth all basis for the denial including all facts supporting Rosciti and AHR's claim that Hanover engaged in tortious interference with

prospective business relations and also naming all parties whose prospective business relationships were interfered.

**ANSWER 13**

Objection, calls for legal conclusion and information protected by work product privilege. Without waiving said objection, South Shore's prospective business relationships with prospective clients, including but not limited to, Earth Tech, Amtrak and Pawtucket Water were damaged to the extent that South Shore was in position to receive future contracts and change orders from these companies which it lost based upon the actions of Hanover. Additionally, once Hanover stopped all income to South Shore through notifying the owners of the Pawtucket Project and Amtrak Project to cease payments to South Shore, the reputation of South Shore was damaged to the extent that it could not even seek any further prospective business.

**AMENDED ANSWER 13**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10, Amended Answer 11, and Amended Answer 12 are reasserted herein. Rosciti and AHR maintain that South Shore's prospective business relationships with prospective clients, including but not limited to, Earth Tech, Amtrak and Pawtucket Water were damaged to the extent that South Shore was in position to receive future contracts and change orders from these companies which it lost based upon the actions of Hanover. Additionally, once Hanover stopped all income to South Shore through notifying the owners of the Pawtucket Project and Amtrak Project to cease payments to South Shore, the reputation of South Shore was damaged to the extent that it could not even seek any further prospective business. Furthermore, without any income, South Shore was unable to seek out and bid on any future contracts. Since Hanover's actions placed South Shore in a position of

insolvency, Hanover not only interfered with South Shore's ability to get new business from the Amtrak Project and Pawtucket Project, it interfered with South Shore's ability to get new business from Earth Tech and prevented it from seeking out and bidding on any new contracts. As Rosciti and AHR maintain that the actions of Hanover in stopping all income to South Shore were outside of the scope of the Agreement of Indemnity, the actions constitute tortious interference with South Shore's prospective business.

**Admission No. 14**

Hanover's claims are not barred by its tortious interference with contractual relations as alleged in Affirmative Defense No. 9 in the Amended Answer to Hanover's Complaint filed by Rosciti and AHR.

**RESPONSE 14**

Denied.

**Interrogatory No. 14**

If the request for admission is denied, please state in detail the basis for the denial, including all facts supporting the Rosciti and AHR's claim of tortious interference by Hanover and also detailing precisely what contractual relations Hanover interfered with.

**ANSWER 14**

Objection, calls for legal conclusion and information protected by work product privilege. Without waiving said objection, see Answer 10, Answer 11, and Answer 13. Furthermore, Hanover caused the owners of Pawtucket Project and the Amtrak Project to cease payments to South Shore, which was continuing to fulfill its obligations under the construction contracts with the owners of

both projects. The loss of income caused by Hanover interfered with South Shore's ability to complete its contractual obligations on both the Pawtucket and Amtrak projects.

**AMENDED ANSWER 14**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10, Amended Answer 11, Amended Answer 12, and Amended Answer 13 are reasserted herein. More specifically, Hanover caused the owners of Pawtucket Project and the Amtrak Project to cease payments to South Shore, which was continuing to fulfill its obligations to perform work under the construction contracts with the owners of both projects. The cessation of all income to South Shore caused by Hanover tortiously interfered with South Shore's ability to complete its contractual obligations on both the Pawtucket and Amtrak projects because Hanover knew or should have known that without income from its only two construction contracts, South Shore would be unable to complete the work it was obligated to perform under its contracts with the owners of the Amtrak Project and the Pawtucket Project. Rosciti and AHR maintain that Hanover's actions were outside the scope of the Agreement of Indemnity, the actions constitute tortious interference with South Shore's contracts with the owners of the Pawtucket Project and the Amtrak Project.

**Admission No. 15**

Hanover's claim is not barred by its own bad faith and unfair dealing as alleged in Affirmative Defense No. 10 of the Amended Answer filed by Rosciti and AHR.

**RESPONSE 15**

Denied.

**Interrogatory No. 15**

If the request for admission is denied, please set forth the basis for the denial in detail, including all facts supporting Rosciti and AHR's claim that Hanover engaged in bad faith and unfair dealing and by stating precisely the instances of bad faith and unfair dealing.

**ANSWER 15**

Objection, calls for legal conclusion and information subject to work product privilege. Without waiving said objection, see Answer 10, Answer 11, Answer 13 and Answer 14. Additionally, Hanover contacted the owners of the Pawtucket Project and the Amtrak Project without the knowledge of South Shore and told them to cease all payments to South Shore. Hanover's actions caused South Shore to become unable to make payments as they came due and created the situation where it was unable to satisfy its obligations. Hanover's actions forced South Shore into insolvency and caused the other indemnitors to be needlessly placed at risk. Had Hanover not forced South Shore into insolvency, South Shore would have been able to satisfy its obligations to both the owners of the Pawtucket Project and Amtrak Project as well as to Hanover.

**ASMENDED ANSWER 15**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10, Amended Answer 11, Amended Answer 12, Amended Answer 13 and Amended Answer 14 are reasserted herein. Specifically, Hanover contacted the owners of the Pawtucket Project and the Amtrak Project, without the knowledge of South Shore, and forced them to cease all payments to South Shore as a condition for Hanover resolving the claims as the owners, despite the fact that Hanover knew or should have known that its actions would cause South Shore to become insolvent and unable to complete its obligations to complete the work under its contracts with the

owners of the Amtrak Project and the Pawtucket Project. Rosciti and AHR maintain that Hanover's actions were outside of the scope of its rights under the Agreement of Indemnity and constituted bad faith and an unfair dealing in that Hanover forced South Shore into insolvency and caused the indemnitors to be needlessly placed at risk. Had Hanover not forced South Shore into insolvency, South Shore would have been able to satisfy its obligations to both the owners of the Pawtucket Project and Amtrak Project to complete the work and would have been able to satisfy its obligations to Hanover. Instead of taking actions that would have allowed South Shore to complete its contractual obligations and be able to satisfy not only the project owners, but Hanover as well, Hanover chose to send South Shore into insolvency, thereby placing the indemnitors in a position of indemnifying Hanover for its own actions in causing South Shore to become unable to satisfy its contractual obligations. Hanover's actions changed the nature of the bargain between the indemnitors and Hanover where the indemnitors agreed to indemnify Hanover for losses incurred through the fault of South Shore, but not caused through the fault or actions of Hanover.

**Admission No. 16**

Hanover's claim is not barred by its breach of fiduciary duty and/or obligation as set forth in Affirmative Defense No. 11 of the Amended Answer to Hanover's Complaint filed by Rosciti and AHR.

**RESPONSE 16**

Denied.

**Interrogatory No. 16**

If the request for admission is denied, please set forth in detail the basis for the denial, including all facts supporting Rosciti and AHR's claim that Hanover breached a fiduciary duty or obligation, the basis for the fiduciary duty or obligation and the party to whom Hanover owed the duty or obligation.

**ANSWER 16**

Objection, calls for legal conclusion and information subject to work product privilege. Without waiving said objection, see Answer 10, Answer 11, Answer 13, Answer 14 and Answer 15.

**AMENDED ANSWER 16**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10, Amended Answer 11, Amended Answer 12, Amended Answer 13, Amended Answer 14 and Amended Answer 15 are reasserted herein. Rosciti and AHR maintain that they did not enter into the Agreement of Indemnity to indemnify Hanover for payments required under the surety agreement that were caused by Hanover's own actions. Hanover had an obligation to the indemnitors not to cause South Shore to become insolvent, thereby placing the indemnitors in a position of risk they had not bargained for under the Agreement of Indemnity. Hanover breached its obligation to the indemnitors not to cause South Shore to default on its obligations.

**Admission No. 17**

Hanover's claims are not barred by its unfair and deceptive acts and/or practices in violation of Chapter 93A of the Massachusetts General Laws as alleged in Affirmative Defense No. 12 in the Amended Answer to Hanover's Complaint filed by Rosciti and AHR.

**RESPONSE 17**

Denied.

**Interrogatory No. 17**

If the request for admission is denied, set forth in detail the basis for the denial, including the facts supporting Rosciti and AHR's claim that Hanover engaged in unfair and deceptive acts in violation of the statute.

**ANSWER 17**

Objection, calls for legal conclusion and information subject to work product privilege. Without waiving said objection, see Answer 10, Answer 11, Answer 13, Answer 14, Answer 15 and Answer 16.

**AMENDED ANSWER 17**

As all of Rosciti and AHR's defenses involve the same operative set of facts, Amended Answer 10, Amended Answer 11, Amended Answer 12, Amended Answer 13, Amended Answer 14, Amended Answer 15 and Amended Answer 16 are reasserted herein. Specifically, Massachusetts General Laws 93A prohibits unfair and deceptive practices between businesses and Hanover committed such unfair and deceptive business practices when, without the knowledge of South Shore, it caused the owners of the Pawtucket Project and the Amtrak Project to cease all payments to South Shore. Hanover knew or should have known that these two projects were South Shore's only sources of income and that causing its income to cease would force South Shore into insolvency. Such conduct was patently unfair and deceptive within the meaning of § 93A.

Submitted by,

Henry V. Rosciti Jr., Vice President
AHR Utility Corporation

STATE OF RHODE ISLAND
PROVIDENCE COUNTY

The above was subscribed and sworn to before me this 7th day of February 2008.

NOTARY PUBLIC LORI J. NORRIS
My Commission Expires: 12-21-08

Submitted by,

Henry V. Rosciti Jr.

STATE OF RHODE ISLAND
PROVIDENCE COUNTY

The above was subscribed and sworn to before me this 7th day of February 2008.

NOTARY PUBLIC LORI J. NORRIS
My Commission Expires: 12-21-08

As to objections:

Submitted by:

Paul J. Moretti Sr., Esq. (#7433)
Tillinghast Licht, LLP
10 Weybosset St.
Providence, Rhode Island 02903
401-456-1200 (Office)
401-456-1210 (Fax)
pmoretti@tllaw.com

CERTIFICATE OF SERVICE

I, Jeannette Jarbeau, hereby certify that on this 7th day of February, 2008, I served the above Response to Plaintiff's Request for Admissions and First Set of Interrogatories to Defendant Henry V. Rosciti, Jr., and AHR Utility Corporation via first class mail, postage prepaid upon:

Kevin C. Cain, Esq. & Ronald Ritland, Esq.,
Peabody & Arnold, LLP,
600 Atlantic Avenue,
Boston, MA 02210

and

Christopher M. Mulhearn, Esq.
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903

Jeannette Jarbeau

@PFDesktop\::ODMA/MHODMA/TLSDMS.TLSLAW.COM;imanage;457431;1