UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

| | |
|---|---|
| THE HANOVER INSURANCE GROUP<br>Plaintiff<br><br>v.<br><br>ANTHONY F. ROSCITI, JR., SHANNON B. ROSCITI, HENRY V. ROSCITI, JR. and AHR UTILITY CORPORATION<br>Defendants | CIVIL ACTION NO. 1:06-cv-00276-T-LDA |
| ANTHONY F. ROSCITI, JR.; and SHANNON B. ROSCITI<br>Plaintiffs<br><br>v.<br><br>THE HANOVER INSURANCE GROUP;<br>Defendants | CIVIL ACTION NO. 1:06-cv-00392-T-LDA |

**PLAINTIFF HANOVER INSURANCE GROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c) and LR Cv. 56, Plaintiff/Counterplaintiff Hanover Insurance Group ("Hanover") submits the following Memorandum of Law, together with Affidavit of Hanover representative Joseph P. Quinn and attached Exhibits, in support of its Motion for Summary Judgment:

1) in favor of Plaintiff Hanover on its Complaint against the Defendants, Anthony F. Rosciti, Jr. and Shannon B. Rosciti ("Roscitis"), Henry V. Rosciti Jr. ("H. Rosciti"), and AHR Utility Corporation ("AHR") and against Counter-Plaintiffs Roscitis on their Counterclaim under Civil Action No. 1:06-cv-00276-T-LDA ("C.A. No. 06-276"); and

2) in favor of Counter-Plaintiff Hanover on its Counterclaim and against Plaintiffs Roscitis on its Complaint under Civil Action No. 1:06-cv-00392-T-LDA ("C.A. No. 06-392").

A. Summary Judgment Standard

Summary Judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavit show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, the court will draw all reasonable inferences in favor of the party opposing the motion. Patterson v. Patterson, 306 F.3d 1156, 1157 (1st Cir. 2002). Once the moving party has properly supported its motion, the burden then shifts to the non-moving party to set forth specific facts showing there is a genuine issue for trial and that a trier of fact could reasonably find in its favor. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

The "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). A party opposing summary judgment cannot discharge its burden by relying upon "conclusory allegations, improbable inferences, and unsupportable speculation." Lopez-Carrasquillo v. Rubianes Gov't. Dev. Inc. of P.R., 27 F.3d 746, 748 (1st Cir. 1994). "Summary Judgment is appropriate if [the opposing party's] evidence is 'merely colorable, or is not significantly probative' to conjure a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S.Ct. 2505 (1986) (citations omitted). [The court] will not accept [the opposing party's] subjective characterizations of events, unless the underlying events themselves are revealed. (citations omitted)." Davric Maine Corp. v. Rancourt, 216 F.3d 143, 146 (1st Cir. 2000).

B. Argument

1. Hanover is entitled to summary judgment on its indemnity claims against all Defendants.

Hanover filed a three-count Complaint against Defendants to enforce its rights under the Indemnity Agreement: Count I – Breach of Contract; Count II – Specific Performance of Indemnity Agreement; and Count III – Declaratory Judgment of Rights under Indemnity Agreement. Hanover has also filed a Counterclaim in response to the separate suit file by Defendants Roscitis, which contain these same three counts. As Hanover has paid losses and expenses under the Indemnity Agreement in excess of the amount requested as collateral in Count II of the Complaint, and as Hanover now seeks only to enforce its rights to reimbursement under the Indemnity Agreement, Hanover seeks judgment only under Count I of its Complaint against these Defendants.

The Indemnity Agreement provides that Defendants are obligated to indemnify and hold harmless Hanover from all loss and expense occasioned by Hanover having written performance and payment bonds on behalf of South Shore on the Pawtucket and Amtrak projects. Specifically, the Indemnity Agreement states in relevant part:

> 2. The Indemnitors shall exonerate, indemnify, and save harmless the Surety from and against every claim, demand, liability, cost, charge, suit judgment and expense which the Surety may pay or incur, including, but not limited to, loss, interest, court costs and consultant and attorney fees:
>
> (a) by having executed or procured the execution of the bonds; or
>
> (b) in making an independent investigation or any claim, demand, or suit; or
>
> (c) in defending any suit, action, mediation, arbitration or any other proceeding to obtain release from liability whether the Surety, in its sole discretion, elects to employ its own attorney or permits or requires Indemnitors to defend the Surety; or

> (d) in enforcing any of the covenants, terms and conditions of this Agreement.
>
> 3. Payment shall be made to the Surety by the Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor.
>
> . . .
>
> The Surety shall have the exclusive right to adjust, settle, or compromise any claim, demand, suit or any other proceeding arising out of any bond against the Surety and/or the Indemnitors, take whatever action it deems appropriate in response thereto, and its determination of whether to defend or settle the same shall be binding and conclusive upon the Indemnitors. In the event of any payment or disbursement by the Surety, the Indemnitors agree to immediately reimburse the Surety for any and all payments and disbursements made (including, but not limited to, interest from the date of the Surety's payments at the maximum rate allowable) under the Surety's belief that liability for the payments existed or that payment was necessary or expedient, *whether or not such liability, necessity or expediency existed.* Vouchers or other evidence of payment by the Surety shall be conclusive evidence of the fact and amount of such liability, necessity, or expediency and of the Indemnitors' liability to the Surety therefor. (emphasis added)

It is well established under Rhode Island law that a surety is entitled to summary judgment on the indemnity agreement of all paid loss and expense absent a showing by the indemnitor with specific, admissible facts that the surety committed fraud or collusion in incurring the loss or expense. The seminal case in Rhode Island is <u>Massachusetts Bonding & Insurance Co. v. Gauteri</u>, 30A.2d 848 (R.I. 1943). In that case, after the indemnitors refused the surety's demand for collateral, the surety resolved the claim presented by the bond's obligee. In defense of the surety's subsequent action on the indemnity agreement, the indemnitors contended that the surety did not act in good faith. The court held, given the "most sweeping character" of the indemnity language (which language referred was the same exact wording as the italicized wording of the Hanover Indemnity Agreement above), unless the indemnitors could show the surety's fraud or collusion with the obligee, the indemnitors are foreclosed from denying their

indemnity obligations. Finding no fraud or collusion present, the Rhode Island Supreme Court affirmed the directed verdict on the indemnity agreement in favor of the surety. 30 A. 2d at 850. The court specifically rejected the indemnitors' claim that a common law standard of good faith be applied when construing the indemnity agreement. 30 A. 2d at 851.

The First Circuit Court of Appeals was presented with the same issue on the very same indemnity agreement language considered critical in Massachusetts Bonding, supra, in the recent cases of Fireman's Insurance Co. of Newark, N.J. v. Todeska Equipment Co., 310 F.3d 32 (1st Cir. 2002) and Constructora Andrade Gutierrez, S.A. v. Am. Int'l Ins. Co., 467 F.3d 38 (1st Cir. 2006). In both cases, the court affirmed the holding in Massachusetts Bonding as still good law in Rhode Island. In Fireman's Insurance, the court affirmed summary judgment in favor of the surety holding that:

> "When a surety brings an action pursuant to an indemnity agreement giving the surety broad discretion to pay claims, the only defense an indemnitor can raise is that the surety committed fraud or collusion in paying the claim." 310 F.3d at 35.

In so ruling, the court again construed as critical the very same italicized language noted above in the Hanover Indemnity Agreement.[1] As in Massachusetts Bonding, the court specifically rejected the claim by the indemnitors that the indemnity agreement contains an implied covenant of good faith and fair dealing, holding:

> "[The indemnitors] must live by the terms of their agreement, which entitle [the surety] to repayment for all claims paid in the absence of fraud or collusion." 310 F.3d at 37.

---

[1] Actually, the indemnity agreement before the Fireman's Insurance court contained a specific reference that the surety act in "good faith." This phrase is not part of the Hanover Indemnity Agreement.

In Constructora Andrade, the Court again construed the same indemnity language italicized above in the Hanover Indemnity Agreement, finding "the sweeping language can be reduced to five words: 'If we pay -- you pay.'" 467 F.3d at 46. In affirming the lower the court's summary judgment for the surety, the court specifically affirmed its holding in Fireman's Insurance.

Under the undisputed facts of this case, Hanover has detailed its loss and expense payments and provided copies of all checks issued in payment of loss and expense as detailed in the Affidavit and Exhibits provided by Hanover Claim Attorney, Joseph P. Quinn. Hanover suffered losses under the Bonds totaling $1,795,679.54. In addition, Hanover incurred a total of $316,329.27 in attorney and consultant fees in resolving the Bond claims and pursuing this action against the Defendants. The total loss and expense is $2,112,008.81. Statement of Undisputed Facts, ¶¶25-27 and Quinn Affidavit, Exhibits 10 and 11.

Pursuant to the terms of the Indemnity Agreement, specifically paragraphs 2 and 3 quoted above, Hanover was given broad discretion in the decision to pay claims under the Bonds. Under paragraph 3, Hanover had the "exclusive right to adjust, settle, or compromise any claim, demand, suit or any other proceeding arising out of any bond against the Surety…" and "take whatever action it deems appropriate in response thereto." The Defendants agreed to "immediately reimburse" Hanover for all payments under Hanover's "belief that liability for the payments existed or that payment was necessary or expedient, whether or not such liability, necessity or expediency existed." Hanover's Affidavit and Exhibits, presenting the detail and

copies of all checks paid on loss and expense, are "conclusive evidence of the fact and amount" of Defendants' liability to Hanover.[2]

As detailed below, Defendants have made no showing that Hanover engaged in fraud or colluded with the owners on the bonded projects in paying the bond claims. Indeed, by letter to Hanover dated April 13, 2006, the Defendants formally acknowledged their collective default under the Indemnity Agreement. Statement on Undisputed Facts, ¶ 22. Accordingly, pursuant to paragraphs 2 and 3 of the Hanover Indemnity Agreement, the Defendants are bound to reimburse Hanover for the full amount of its loss and expense, plus interest, in this matter.

2. Hanover is entitled to summary judgment on all claims and defenses of Defendants.

Defendants Roscitis asserted six causes of action (and request for declaratory relief) against Hanover in its Complaint. Roscitis also asserted the same causes of action in their Counterclaim in response to Hanover's Complaint. Defendants H. Rosciti and AHR amended their Answer to the Hanover Complaint setting forth affirmative defenses that repeat the allegations made by the Roscitis in their Complaint and Counterclaim. As there is no genuine

---

[2] The Courts that have considered this issue of presumption have typically dealt with the more common language in indemnity agreements that presentation of evidence of loss and expense payments by the surety is "prima facie" evidence of the indemnitor's liability. Under such language, the Courts have construed this as creating a presumption in favor of the surety and imposing a burden on the indemnitors to produce evidence sufficient to defeat the presumption. United States ex rel. Doten's Constr., Inc. v. JMG Excav. & Constr. Co., Inc., 2005 U.S. Dist. LEXIS 26732 (D. Me. 2005); Enbrock v. Federal Ins. Co., 370 F.2d 784 (5th Cir. 1967); U.S. Fidelity & Guaranty Co. v. Feibus, 15 F.Supp.2d 579 (M.D. Pa. 1998). There are, however, cases which have construed the same language as found in the Hanover Indemnity Agreement that the presentation of the surety's evidence regarding payment is "conclusive" evidence of a fact and extent of liability. In these cases, the Courts have concluded, upon a showing of the surety's payments under the bonds, that the indemnitors are contractually bound to reimburse it. United States Fidelity & Guaranty Co. v. Jones, 87 F.2d 346, 348 (5th Cir. 1937) ("if any loss, cost, damage, charge, or expense has accrued to [the surety] on account of a claim made under or in connection with the bond, [the indemnitor] is bound to repay the same"); Home Indemnity Co. v. Wachter, 115 A.D. 2d 590, 591 (N.Y. App. Div., 2d Dept.) ("the indemnitors were contractually bound to accept any good-faith determination the surety deemed appropriate with respect to the settlement of any claim").

issue as to any material fact and as Hanover is entitled to judgment as a matter of law, Hanover is entitled to summary judgment dismissing these claims and defenses.

a. The indemnitors are precluded from asserting defenses other than the surety's fraud or collusion.

As detailed above, Rhode Island law precludes the indemnitors from raising any defenses to the surety's indemnity action other than the surety's fraud or collusion with the owners/obligees in paying the claims. Massachusetts Bonding, Fireman's Insurance, and Constructora Andrade, supra. Further, these cases make it clear that Rhode Island law precludes the insertion of an implied covenant of good faith and fair dealing into an indemnity agreement such as Hanover's. None of the causes of action or defenses asserted by Defendants provide a basis for a claim that Hanover engaged in fraud or collusion in resolving the Bond claims.

Further, in response to Hanover's specific inquiries during discovery, Defendants failed to detail any basis for an allegation that Hanover engaged in fraud or collusion. Hanover specifically presented a request for admission and interrogatory seeking all information from Defendants to support an allegation that Hanover engaged in fraud or collusion. In response, Defendants were unable to state any basis for fraud or collusion, stating only that Hanover was in contact and negotiated with Earth Tech and Amtrak, and that Hanover contacted these owners to request that they refrain from releasing contract funds without Hanover's prior consent. Statement of Undisputed Facts, ¶24.

Obviously, Hanover's contact and negotiation with the owners was critical and necessary in order for Hanover to resolve the performance bond claims that each owner presented under the applicable bonds. Further, assuming arguendo that Hanover's March 21, 2006 letters to the owners requesting them to refrain from releasing funds to South Shore was somehow wrongful, certainly this action was not based in fraud and did not involve any collusion with the owners.

Sending the letters was Hanover's decision alone made solely to protect its indemnity rights after presented with the bond claims. In fact, as detailed more fully below, Hanover's action in contacting these owners was completely justified under the facts, the terms and conditions of the Indemnity Agreement and the applicable law.

b. Hanover's letters of March 21, 2006 to the owners/obligees on the bonded projects were justified.

In this case, Defendants base all of their claims and defenses in this matter on one allegation alone – namely, the March 21, 2006 letters which Hanover sent to EarthTech on the Pawtucket Project and to Amtrak on the Amtrak Project requesting that each not release further contract funds to South Shore without Hanover's prior consent was somehow wrongful. Statement of Undisputed Facts, ¶¶20, 30, and 31. Please also see Roscitis' Complaint, ¶17 and Roscitis' Counterclaim, ¶16.

The problem with this argument is that at the time Hanover sent the March 21, 2006 letters, South Shore and the Defendants were already in default of their Indemnity Agreement obligations (which default was formally acknowledged by all indemnitors through their letter to Hanover dated April 13, 2006, Statement of Undisputed Facts, ¶22). By the time the letters were sent to EarthTech and Amtrak --

-- Hanover was aware that South Shore had collected monies on subcontractor, G. Donaldson's behalf from owner EarthTech on the Pawtucket Project, but other than payment of $100,000, had failed to remit monies collected to G. Donaldson. Statement of Undisputed Facts, ¶¶6-8, 11.

-- G. Donaldson had filed suit against Hanover under the payment bond for the Pawtucket Project, alleging non payment of $530,000 by South Shore. Statement of Undisputed Facts, ¶10.

-- A material supplier of South Shore, Vellano Brothers, filed its claim on March 3, 2006, alleging it had supplied $755,000 worth of materials to South Shore on the Pawtucket Project from May 2005 to January of 2006, but had received no payments from South Shore. Statement of Undisputed Facts, ¶12.

In response to these claims, on March 17, 2006, Hanover demanded collateral from the indemnitors individually and collectively, in the amount of $1.3 million, which was the approximate total of these claims. Statement of Undisputed Facts, ¶13. During their depositions, Defendant Anthony Rosciti, Jr., as president of South Shore and AHR and personally, stated that they did not post collateral because of their financial difficulties and because they had disputes with the claims (Statement of Undisputed Facts, ¶14); Henry Rosciti testified he did not post collateral because he lacked the funds to do so (Statement of Undisputed Facts, ¶15); Shannon Rosciti testified that she did not post collateral because she knew nothing of the facts of this case, but did not dispute that she owed Hanover funds (Statement of Undisputed Facts, ¶16).

Under paragraph 3 of the Indemnity Agreement, the Indemnitors/Defendants were required to "immediately" post collateral satisfactory to Hanover to indemnify it "as soon as liability exists or is asserted against the Surety." (Statement of Undisputed Facts, ¶4(b)).[3] In failing to post collateral, South Shore and the Defendants were individually and collectively in default of their indemnity obligations as of March 21, 2006. H. Rosciti and AHR admitted, in response to Hanover's request for admissions, that this failure was a default of the Indemnity Agreement. (Statement of Undisputed Facts, ¶18). While the Roscitis denied that this was a default of the Indemnity Agreement, they admitted in their responses to Hanover's request for admissions that they had a duty to post collateral in response to Hanover's demand and failed to do so. (Statement of Undisputed Facts, ¶19).

In addition, South Shore's failure to pay G. Donaldson and Vellano Brothers from funds it collected on the Pawtucket project was a default of paragraph 7 of the Indemnity Agreement.

[3] In other words, Anthony Rosciti's deposition testimony, referenced above, that they did not post collateral for the additional reason that there were disputes on the bond claims was not relevant under the terms of the Indemnity Agreement.

Indemnitors agreed under that paragraph to hold funds received on bonded projects in trust for the payment of the Bond and obligations. The trust specifically inured to the benefit of Hanover. (Statement of Undisputed Facts, ¶4(f)). Further, upon receipt of these two claims, Hanover had the right to "take such action as it deemed appropriate," which action would include sending letters to the owners to stop payment of contract funds (Statement of Undisputed Facts, ¶4, fn 2).

These failures to post collateral and pay the subcontractor and supplier constituted defaults under paragraph 6 of the Indemnity Agreement, and under paragraph 5, triggered Hanover's rights to contact the owners and assert its rights to the assignments of all bonded contract funds of South Shore on those two projects. (Statement of Undisputed Facts, ¶4(d)). Accordingly, Hanover's letter to the owners on March 21, 2006, which letter merely requested a stop on payment of funds to South Shore without Hanover's prior consent, was certainly justified by these facts and the language of the Indemnity Agreement. As of March 21, 2006, there existed a distinct possibility that further funds would be diverted by South Shore from these bonded projects, thus increasing Hanover's risk to a higher loss under the Bonds. Hanover's action to stop the funds, under these circumstances, was neither wrongful nor tortious, but prudent.

The courts which have considered this specific issue have reached the same conclusion. In Gerstner Electric, Inc. v. American Ins. Co., 520 F.2d 790 (8th Cir. 1975), the court found that the surety's action in stopping contract funds from payment to the principal was not wrongful interference with the contract between the principal and the owner. The court noted that the surety sent a stop-funds' telegram to the owner after it had received a claim from the subcontractor on the bonded project. The indemnity agreement contained an assignment clause and clause granting the surety discretion to take action it deemed appropriate in response to

claims, similar to the language from paragraphs 5 and 3, respectively, of the Hanover Indemnity Agreement. In holding the surety's action was not wrongful but justified under these facts, the court stated:

> "[The surety] did not ask the owner to pay any money to it, nor did it seek any profit by attempting to make use of the money… That [the surety's] concern respecting its exposure to a substantial loss was wholly justified is demonstrated by the fact that it was soon a defendant in an action filed against it by [the subcontractor]… under which the [the surety] might sustain substantial loss if the [owner] had not withheld the funds." 520 F.2d at 795.

In the case of National Surety Corp. v. Prairieland Construction, Inc., 354 F. Supp. 2d 1032 (E.D. Ms. 2004), the court considered facts very similar to those of the present case. Upon notice of the principal's failure to meet its obligations to the owners and various subcontractors on the two bonded projects, the surety sent a letter to the owners on both projects requesting that they pay no further contract funds to the principal without the surety's consent. After suffering losses under the payment and performance bonds, the surety filed suit against the indemnitors and later sought summary judgment on its indemnity claim.

In response, the indemnitors asserted claims and defenses against the surety for breach of contract, tortious interference with contracts, and declaratory judgment, which claims were based entirely on the allegation that the stop-fund letters that the surety had sent caused the contractor to fail and, therefore, the indemnity agreement should not be enforced against them. The court found that the indemnity agreement provided that, upon default of the indemnitors, the surety had the right to take such action as it deemed appropriate in response to claims. It was clear from the facts of the case that, at the time the letters were sent, the principal contractor was in default of the bonds and indemnity agreement by failing to pay his subcontractors, while

diverting the ear-marked contract funds for other purposes. In granting the surety's summary judgment motion and denying the indemnitors cross-motion for summary judgment, the court held that the surety was justified in sending the letters. 354 F. Supp. 2d at 1040.

In the case of General Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp., 975 F.Supp. 511 (S.D. N.Y. 1997), the surety filed a summary judgment motion on its indemnity agreement against the indemnitors. After the surety received claims from various owners relating to claims of the principal contractors subcontractors and suppliers, the surety advised the owners to refrain from further contract payments to the principal contractor without the surety's consent. The surety also demanded collateral from the indemnitors, which they failed to post. The court held "in the absence of an indication of fraud or collusion," the surety had the right to resolve the claims and be reimbursed by the indemnitors. 975 F.Supp at 516. In rejecting the indemnitors' claims that the surety acted in bad faith and interfered with its contracts with the owners, the court found that the surety's exercise of its indemnity rights by settling the claims and asserting rights to the contract funds was justified, especially where the indemnitors refused the surety's demand for collateral. 975 F.Supp. at 519.[4]

Given these facts, the terms and conditions of the Indemnity Agreement, and the case law, Hanover was clearly justified in contacting the owners on March 21, 2006 to request that they refrain from paying any further contract funds to South Shore without Hanover's consent. This would be true even if Rhode Island applied a good-faith standard to enforcement of indemnity agreements. Hanover's actions were not in bad faith, nor did its actions improperly or tortiously infer with South Shore's contractual rights with the owners.

[4] See also, Hutton Construction Co. v. County of Rockland, 52 F.3d 1191, 1192 (2nd Cir. 1995) (The indemnitors' failure to post collateral demanded by the surety triggered the assignment clause under the indemnity agreement, giving an assignment to the surety to all of the principal's rights under the bonds and underlying contracts).

c. Defendants' specific claims and defenses have no basis in fact or law.

As indicated above, Roscitis assert six causes of action in their Complaint and repeat these same causes of action in its Counterclaim to Hanover's Complaint: i) breach of contract; ii) tortious inference with contract; iii) tortious interference with prospective business advantage; iv) bad faith; v) breach of fiduciary duty; and vi) unfair and deceptive acts or practices under M.G.L. ch. 93A, §11. Roscitis also seek declarations of certain statements relating to the claims that Hanover's stop fund letters to the owners were wrongful. H. Rosciti and AHR have set up affirmative defenses parroting these actions/allegations made by Roscitis. Hanover also asserts its entitlement to summary judgment based on the following arguments relating to each specific claim.

i. Breach of contract

It is clear, from the undisputed facts and the terms and conditions of the Indemnity Agreement, that there was no breach of it by Hanover. In fact, the Indemnity Agreement contains no duties to be performed by Hanover, detailing only the duties owed to Hanover by the indemnitors. Given the fact that Rhode Island law does not insert the common law duty of good faith and fair dealing when construing the terms and conditions of indemnity agreements, there can be no cause of action for breach of the Indemnity Agreement by Hanover.

Further, as observed in National Surety, supra, since the breach of contract claim asserted by the Roscitis really arose out of the allegation that Hanover, in sending the stop fund letters, interfered with the contract South Shore had with EarthTech and Amtrak, this is really a tortious interference claim. National Surety Corp., 354, F.Supp.2d at 1039.

ii. Tortious interference with contract

In a nutshell, defendants claim that Hanover's stop-fund letters tortiously interfered with South Shore's contracts with EarthTech and Amtrak. In Rhode Island, although this cause of action is recognized, it cannot be asserted against another party to the contract.

> "By the rule of Jolicoeur[5], suits brought under Rhode Island law can only be maintained against non-contractual third parties." U.R.I. Cogeneration Partners L.P. v. Board of Governors, 915 F.Supp.1267, 1289 (D. R.I. 1996).[6]

All of the performance bonds that Hanover wrote on behalf of South Shore (Exhibit 1, Quinn Affidavit) contain a clause, under paragraph 1, that the underlying construction contract between South Shore and the owner is incorporated by reference into the performance bond. As such, Hanover was a party to the underlying construction contracts between South Shore and EarthTech and South Shore and Amtrak. Accordingly, under Rhode Island law, the Defendants are precluded from asserting a claim or defense of tortious interference with contract against Hanover.

This precise reasoning has been adopted in cases construing this cause of action in the surety context. National Surety Corp., supra, 354 F.Supp.2d at 1039, 1040 (as the bond incorporated the underlying construction contract by reference, the surety "cannot be liable for interfering with contracts to which it was a party"); Travelers Cas. & Surety Co. of Am. v. Amoroso, 2004 U.S. Dist. LEXIS 17604 at 12 (N.D. Ca. 2004) (a tortious interference claim could only be asserted against a stranger to the contract, the surety had a direct interest in completion of the construction contract and, therefore, was not a stranger).

---

[5] Refers to Rhode Island Supreme Court case, Jollicoeur Furniture Co., Inc. v. Baldelli, 653 A.2d 740 (R.I. 1995).

[6] See also, Ed Peters Jewelry Co. v. C. & J. Jewelry, 124 F.3d 252, 275 (1st Cir.1997) (a party cannot normally "interfere" with his own contract).

In any event, as previously stated, defendants can provide no basis to support this cause of action as the surety's actions in stopping the contract funds were completely justified under these facts. Gerstner Electric, Inc., supra, 520 F.2d at 793-705; General Accident Ins. Co. of Am., supra, 975 F.Supp. at 519.

iii. Tortious interference with prospective business advantage

This cause of action is recognized in Rhode Island and has the following elements: 1) the existence of a business relationship or expectancy; 2) that the defendant knew of that relationship or expectancy; 3) that the defendant intentionally interfered with that relationship or expectancy; and 4) that the interference caused the plaintiff to sustain the damages claimed. Mesolella v. Providence, 508 A.2d 661, 669 (R.I. 1986); Pharm. Servs. V. Swarovski N.Am. Ltd., 2006 U.S. Dist. LEXIS 12573 at 10 (D. R.I. 2006). A defendant may not be held liable unless his conduct was "improper or unjustified." Pharm. Servs., Id., at 12.

Defendants have made absolutely no showing to support this claim, nor, under these facts, can they. They have not shown what specific, prospective business with which Hanover interfered, or, if it existed, that Hanover knew of the prospective business relationship or expectancy, or that Hanover acted improperly in response. Under Rhode Island law, Defendants' conclusory allegations in the Complaint and Counterclaim of unspecific "business relationships" or "contemplated contracts of economic benefit" does not sufficiently state a cause of action (see Roscitis' Complaint, ¶¶ 35 – 37; Roscitis' Counterclaim, ¶¶ 34-36) P.S.W., Inc. v. Visa, Inc., 2006 U.S. Dist. 11763 at 49, 50 (D. R.I. 2006); Ed Peters, supra, 51 F.Supp.2d at 102.

Finally, the Defendants are again referring to the stop fund letters as sole basis for this interference claim. As indicated above, Hanover's action in writing to the owners was justified by the facts of the case, the terms and conditions of the Indemnity Agreement and the applicable law.

iv. Bad faith

In this case, Hanover is seeking to enforce its rights under the Indemnity Agreement. As the cases cited above in Section B(1) of the Argument demonstrate, Rhode Island courts have specifically rejected the claims by indemnitors that the indemnity agreement contains an implied covenant of good faith and fair dealing. The Roscitis allege that Hanover owed them a duty of good faith and fair dealing and that its stop fund letters to Amtrak and Earth Tech breached that duty. Roscitis' Complaint, ¶¶ 41 and 42; Roscitis Counterclaim, ¶¶ 40 and 41. Therefore, there is no basis in law for this claim and, accordingly, Hanover is entitled to summary judgment dismissing this claim and defense.

v. Fiduciary duty

Roscitis claim that the Indemnity Agreement implies a fiduciary relationship and that Hanover breached the fiduciary duty by sending the stop fund letters to Amtrak and EarthTech. Roscitis' Complaint, ¶¶ 46 and 47; Roscitis' Counterclaim, ¶¶ 45 and 46.

Initially, in light of the Rhode Island law that the Indemnity Agreement does not contain an implied covenant of good faith and fair dealing, it is difficult to imagine there being an implied fiduciary duty of Hanover to the Defendants. In other words, if the Defendants can defend the Hanover's indemnity claim only on a showing of fraud or collusion, then this does not reasonably imply that there exists a fiduciary duty owed by Hanover to the Defendants under the Indemnity Agreement.

Indeed, the courts specifically addressing this issue in the surety context have concluded no such fiduciary duty exists. <u>Northwestern Nat'l. Ins. Co. v. Alberts</u>, 269 F.Supp.498, 508, 509 (S.D. N.Y. 1991) (the grant of a power of attorney under the indemnity agreement did not imply a fiduciary duty by the surety to the indemnitors); <u>Transamerica Ins. Co. v. H.V.A.C. Contractors, Inc.</u>, 857 F.Supp. 969, 975 (N.D. GA 1994) ("no authority for the proposition that a

surety owes any fiduciary duty to its indemnitors beyond the duties included in the [indemnity] contract"); Associated Indemnity Corp. v. CAT Contracting, Inc., 964 S.W. 2d 276, 288 (Tx. 1998) (the indemnity agreement implied no special relationship between the surety and indemnitors; therefore, there was no fiduciary duty owed by the surety).

As claim and defense has no bases in law or fact, Hanover's motion for summary judgment against Defendants on this claim and defense should be granted.

vi. Unfair and deceptive acts or practices under M.G.L. ch. 93A, §11.

Roscitis present an unspecified allegations that Hanover engaged in unfair and deceptive acts. Roscitis' Complaint, ¶¶ 52 and 53; Roscitis' Counterclaim, ¶¶ 51 and 52. Since then, they have presented no further evidence in support of this unspecified claim. As Rhode Island law does not recognize an implied covenant of good faith and fair dealing in construing surety indemnity agreements, as discussed above, there are compelling reasons why a Massachusetts' statute concerning unfair and deceptive practices would not be applied in construing this Indemnity Agreement under Rhode Island law.

Moreover, no cause of action exists under M.G.L. ch. 93A, §11 unless the "transactions constituting the alleged . . . unfair or deceptive acts occurred primarily and substantially within [Massachusetts]." In Clinton Hospital Assoc. v. Corson Group, Inc., 907 F.2d 1260, 1262-66 (1st Cir. 1990), the First Circuit Court of Appeals considered the following in deciding whether the transaction occurred "primarily and substantially" in Massachusetts: 1) where the defendant committed the deceptive or unfair acts or practices; 2) where plaintiff received and acted upon the deceptive or unfair acts; 3) the situs of plaintiff's losses due to the unfair or deceptive practices or acts.

Here, although not specified, Defendants are likely referring again to the stop fund letters as the basis for the claim of unfair or deceptive acts. Other than the fact that the letters were sent

from Massachusetts to Rhode Island, there is no other connection with Massachusetts concerning this transaction. Copies of the letters were received by South Shore and, presumably, by Roscitis in Rhode Island. Although unspecified by Defendants, it is likely they claim that any damages claimed to South Shore and Roscitis occurred in Rhode Island, as South Shore and Roscitis were located there. Accordingly, under these facts, one cannot conclude that the alleged unfair or deceptive acts occurred "primarily and substantially" in Massachusetts.

Further, as stated repeatedly above, the facts of this case, the terms and conditions of the Indemnity Agreement and the applicable law all support the conclusion that Hanover's action to stop payment of the contract funds was justified. Accordingly, these actions cannot be construed as unfair or deceptive acts under this statute. Hanover is entitled to its summary judgment dismissing this claim and defense.

3. Defendants are estopped from disputing the loss portion of Hanover's indemnity claim.

In May of 2006, Anthony Rosciti, Jr., as president and owner of South Shore, instituted a receivership proceeding in Rhode Island Superior Court against South Shore. Prior to its removal to this Court, the Superior Court, on motion of Roscitis, consolidated their Rhode Island State Court action against Hanover (now C.A. No. 06-392) with the receivership action. After notice to all interested parties, and hearing on February 28, 2008, Hanover's amended proof of loss against South Shore in the receivership action was approved by the Superior Court in the full loss amount of $1,795,679.54 claimed here, on the basis of the same documentation provided in support of this motion. Statement of Undisputed Facts, ¶¶28, 32, 33.

As all Defendants, through the consolidation of the action, are parties to that receivership action, they are estopped from relitigating the loss portion of the Hanover indemnity claim. In any event, there can be no question that Defendant Anthony Rosciti, Jr., as plaintiff in the

receivership action, is a party to that action and bound by that determination of the receivership court on Hanover's amended proof of loss.

Alternatively, even if Defendants are not considered parties to the receivership action, they should be collaterally estopped from relitigating the loss here. Under Rhode Island law, a party is collaterally estopped from litigating issues finally determined on the merits in a prior proceeding if there is an identity of issues and the parties against whom collateral estoppel is asserted are the same parties or in privity with a party in the prior proceeding. State v. Chase, 588 A.2d 120, 127 (R.I. 1991). " 'Parties are in privity when there is a commonality of interest between the two entities and when they sufficiently represent each other's interests.' (citations omitted)." Commercial Union Ins. Co. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999). Calhoon v. Shelton, 2008 U.S. Dist. LEXIS 696 at 10 (D. R.I. 2008) (citing Commercial Union, Id.).

Under these facts, there is unquestionably an identity of issues and finality of judgment. In addition, it cannot be disputed that Defendant Anthony Rosciti, Jr. has commonality of interests with the other Defendants and sufficiently represented their interests in the receivership action. At all times relevant, Anthony was husband to Shannon Rosciti, cousin to and co-owner of AHR and South Shore with Henry Rosciti, Jr., and president and co-owner of AHR.

For all these reasons, all Defendants should be estopped from relitigating the issue of Hanover's loss claim under the Indemnity Agreement. Accordingly, Hanover is entitled to judgment against all Defendants on this loss amount of $1,795,679.54.

C. Conclusion

Under Rhode Island law, indemnitors are precluded from contesting a surety's indemnity claim on grounds other than the surety committed fraud or colluded with the owners on the bonded projects in paying the bond claims. In this case, Defendants have made no such showing. On the contrary, the Defendants all acknowledged their collective default under the

Indemnity Agreement. Defendants' claims and defenses, all based on their assertion that Hanover's action in sending stop fund letters to the bonded owners was wrongful, are not supported in law or fact, as Hanover's action was justified. Further, for various reasons, Defendants specific claims and defenses against the Hanover are meritless. Finally, Defendants are estopped from relitigating at least the loss portion of Hanover's indemnity claim as that claim has been already finally determined in the collateral receivership proceeding of South Shore.

For all these reasons, Hanover respectfully requests summary judgment against all Defendants on Hanover's action under C.A. No. 06-276 in the loss amount of $1,795,679.54, expense amount of $316,329.27, for a total of $2,112,008.81, together with pre-judgment interest accruing from the dates of payment, and dismissing with prejudice Roscitis' Counterclaim against it. Hanover also respectfully requests summary judgment dismissing with prejudice the Roscitis' action under C.A. No. 06-392 against Hanover, and granting Hanover judgment on its Counterclaim in the above amounts.

Respectfully submitted,

THE HANOVER INSURANCE GROUP

By its attorneys,

/s/ Ronald E. Ritland
Ronald E. Ritland, *pro hac vice*
Kevin C. Cain, #3960
PEABODY & ARNOLD LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
[617] 951.2100

Dated: June 20, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the within document was served via electronic mail on the following on this 20th day of June, 2008:

Joseph D'Angelis – jdeangelis@tllaw.com
Christopher Mulhearn – cmulhearn@frlawri.com

/s/Ronald E. Ritland
Ronald E. Ritland

683859_1
2114-92646