UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE HANOVER INSURANCE GROUP,<br><br>Plaintiff<br><br>vs.<br><br>ANTHONY F. ROSCITI, JR.; HENRY V. ROSCITI; and A.H.R. UTILITY CORPORATION,<br><br>Defendants | : | C.A. No.: 06-276/T |
| ANTHONY F. ROSCITI, JR.; AND SHANNON B. ROSCITI,<br><br>Plaintiffs<br><br>vs.<br><br>THE HANOVER INSURANCE GROUP; SOUTH SHORE UTILITY CONTRACTORS, INC., by and through Jonathan N. Savage, Esq., duly appointed Permanent Receiver of South Shore Utility Contractors, Inc.; HENRY V. ROSCITI; and AHR UTILITY CORPORATION, | : | C.A. No. 06-392/T |

**MEMORANDUM IN SUPPORT OF ANTHONY F. ROSCITI, JR. AND SHANNON B. ROSCITI'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants, Anthony F. Rosciti, Jr. and Shannon B. Rosciti (collectively, the "Roscitis"), and each of them, by and through counsel, and hereby submit the within memorandum in support of the Roscitis' accompanying objection to Plaintiff, The Hanover

Insurance Group's ("Hanover") motion for summary judgment in connection with the above-identified action.

**Introduction**

Despite being apprised that South Shore Utility Contractors, Inc. ("South Shore") had agreed to the terms of a settlement relative to an ongoing dispute with a subcontractor, G. Donaldson Construction, Inc. ("G. Donaldson") with respect to the Pawtucket Project, and, further, that South Shore advanced a good faith position with respect to a dispute with a second contractor, Vellano Bros., Hanover took it upon itself on or about March 21, 2006, to communicate directly with the project owners for the Pawtucket Project and Amtrak Project, respectively, and direct said owners to not release any further contract funds to South Shore absent Hanover's express consent. In so doing, Hanover intentionally interfered with South Shore's contractual relations with the above project owners, which resulted in "cutting off" South Shore's flow of funds with respect to said projects, notwithstanding that South Shore continued to discharge and complete its scope of work with respect to the same. Moreover, at this time South Shore was not in default of its obligations under its contracts with the project owners.

Hanover's precipitous action resulted in South Shore being unable to consummate its settlement with G. Donaldson, "fall into default" with the project owners, and create an artificial default with respect to the individual indemnitors under the Indemnity Agreements even though there had been no acknowledgements of voluntary default and/or letters of direction signed by South Shore and/or any of the indemnitors. Simply put, Hanover created a default where one did not, and otherwise, should not, exist. In doing so, Hanover artificially established its indemnity

claims as against the Roscitis, all while purporting to work cooperatively with South Shore relative to its issues.

It is beyond dispute that Hanover's action adversely impacted South Shore's business operations, resulted in its inability to complete the Pawtucket Project and Amtrak Project, respectively, and further, resulted in a significant loss that now forms the basis of Hanover's claims in the instant matter. Hanover took this action on March 21st even though it was fully apprised of the status of South Shore's settlement with G. Donaldson, its good faith position with respect to the Vellano Bros. dispute, the fact that South Shore was not in default of its contracts with the project owners for the Pawtucket Project and Amtrak Project, respectively, and that South Shore was faithfully discharging its scope of work and completing the same relative to the subject projects. In essence, all Hanover's self-serving action did was leverage an acknowledgement of default from South Shore, and the individual indemnitors, and hasten the demise of a previously successful business operation.

Notwithstanding, Hanover's conduct should not be rewarded by the granting of a summary judgment with respect to the Roscitis' Counterclaim, and those claims should be permitted to be presented to a fact finder for judicial determination as to whether or not the Roscitis have set-offs against Hanover with respect to its indemnification claim.

**Pertinent Facts**

In or about 2005, The Hanover Insurance Group ("Hanover") furnished certain performance and payment bonds on behalf of its principal, South Shore, naming Earth Tech and O. Ahlborg and Sons, Inc. (collectively, "Earth Tech"), respectively, as obligees for that certain project known as the Pawtucket Water Treatment Facility (the "Pawtucket Project") in the total

amount of Five Million Six Hundred Sixteen Thousand Thirty Dollars and 00/100 ($5,616,030.00) (the "Pawtucket Project Bonds"). *See Affidavit of Anthony F. Rosciti, Jr. )"Rosciti Affidavit") at ¶2.*

In addition, at or about that same time, Hanover furnished certain payment and performance bonds or on behalf of its principal, South Shore, naming the Amtrak-National Railroad Passenger Corporation ("Amtrak"), as obligee for a project known as the Freight Rail Improvement Project, twenty-four (24) inch water main relocation in Providence, Rhode Island (the "Amtrak Project") in the amount of Three Hundred Sixty-Five Thousand Nine Hundred Dollars and 00/100 ($365,900.00) (the "Amtrak Project Bonds"). *See Rosciti Affidavit at ¶3.*

In or about May, 2005, South Shore, Anthony F. Rosciti, Jr. ("A. Rosciti"), Shannon B. Rosciti ("S. Rosciti"), Henry Rosciti ("H. Rosciti") and A.H.R. Utility Corporation ("AHR"), and each of them, executed an Agreement of Indemnity (the "Indemnity Agreement") in favor of Hanover relative to the Pawtucket Project Bonds and the Amtrak Project Bonds, respectively. *See Rosciti Affidavit at ¶4.*

Subsequent to the commencement of the Pawtucket Project and Amtrak Project, respectively, and during South Shore's discharge of its scope of work in connection with these projects, South Shore had disputes with two (2) of its subcontractors regarding payment. *See Rosciti Affidavit at ¶5.* One of the disputes involving the Pawtucket Project related to measurement and payment terms in a subcontract. That dispute involved G. Donaldson Construction Co., Inc. ("G. Donaldson"), with whom South Shore ultimately reached an agreement as to settlement, payment terms and a payment schedule relative to the subject dispute in or about March, 2006. South Shore's subcontract with G. Donaldson was a quantity and sum certain subcontract, and

not simply a lump sum contract. See Rosciti Affidavit at ¶6. In fact, South Shore, by and through its counsel, advised Hanover, by and through its counsel, as to the pendency of South Shore's agreement to settle and pay an agreed-upon amount with respect to the G. Donaldson claim. *See Rosciti Affidavit at ¶7.*

At or about this same time, South Shore and Hanover were engaged in a dialogue and Hanover had requested certain information relative to the G. Donaldson claim, as well as the South Shore's status with respect to the so-called Pawtucket Project and Amtrak Project, respectively, and its financial condition. See Rosciti Affidavit at ¶8. In fact, on March 21, 2006, the very same day that Hanover wrote directly to the project owners for the Pawtucket Project and Amtrak Project, respectively, and instructed each of them to not release further contract funds to South Shore absent Hanover's express consent, Hanover, by and through its counsel, made a written request upon South Shore to review certain of South Shore's financial information and/or documents, and, further, to meet to review the same with A. Rosciti and South Shore's other shareholder, H. Rosciti. *See Rosciti Affidavit at ¶9.*

Notwithstanding, however, without prior notice to or the consent of South Shore, and despite South Shore's good faith efforts, on March 21, 2008, Hanover contacted the project owners directly, and instructed each of them that no further contract funds be released to South Shore. *See Rosciti Affidavit at ¶10.*

On or about March 21, 2006, South Shore was still on the job discharging its scope of work relative to the Pawtucket Project and Amtrak Project, respectively, and, further, was not in default of its contracts with the project owners in connection with the same. Even more, the same occurred despite the G. Donaldson settlement. *See Rosciti Affidavit at ¶11.* Additionally,

Hanover's March 21st communication occurred less than two (2) full business days following its March 17, 2006 demand to the indemnitors under the Indemnity Agreement that they post additional collateral. *See Rosciti Affidavit at ¶12.* As of March 21, 2006, the Roscitis were not in default of the Indemnity Agreement insofar as they had not yet had a reasonable opportunity to consider and act on Hanover's March 17th demand to post additional collateral. *See Rosciti Affidavit at ¶13.*

The other subcontractor dispute also involved the Pawtucket Project, wherein a subcontractor, Vellano Bros., was applying payments on the Pawtucket Project and other "bonded" work to only outstanding requisitions on "non-bonded" projects, and, thus creating an inflated receivable. South Shore's records supported its position with regard to Vellano Bros. *See Rosciti Affidavit at ¶14.*

Hanover had knowledge that South Shore had settled the dispute with G. Donaldson, and that South Shore's records supported South Shore's position relating to the Vellano Bros. dispute. *See Rosciti Affidavit at ¶15.* Despite the settlement of the G. Donaldson dispute, and the good faith position advanced by South Shore relative to the Vellano Bros. dispute, Hanover took it upon itself on March 21, 2006, to communicate directly with the owners on both the Pawtucket Project and the Amtrak Project, respectively, and, further, notified and directed those owners not to make any further payments to the South Shore, which said action was without the prior knowledge or authorization of South Shore, and despite the fact that South Shore was not in default of those project contracts. *See Rosciti Affidavit at ¶16.*

As a result of Hanover's motions, South Shore's "flow of funds" from the subject projects was "cut-off" and South Shore could not consummate the G. Donaldson settlement. *See Rosciti*

*Affidavit at ¶17.* Hanover took this March 21st action even though South Shore had not defaulted on its contracts, that neither South Shore nor any of the individual indemnitors had acknowledged any voluntary default under the Indemnity Agreement, and South Shore had not yet consented to a letter of direction with respect to the payment of remaining contract funds relative to the subject projects. *See Rosciti Affidavit at ¶18.*

Hanover's March 21, 2006 communication, and the resulting effect of the same created a default of South Shore relative to the Pawtucket Project and Amtrak Project, respectively, where one previously, and otherwise, did not exist as of March 21st. *See Rosciti Affidavit at ¶19.* By April, 2006, with all income from the Pawtucket Project and Amtrak Project, respectively, "cut-off", South Shore no longer had the ability to conduct an otherwise successful business, including completing the subject projects and so advised Hanover. *See Rosciti Affidavit at ¶20.*

However, South Shore's principal, A. Rosciti was able to secure a take-over arrangement with Rosciti Construction that ensured the completion of the Pawtucket Project and Amtrak Project, respectively, despite Hanover's action. *See Rosciti Affidavit at ¶21.* A. Rosciti only executed, and acknowledged, a voluntary default on behalf of himself and South Shore on or about April 13, 2006, as well as signed a direction of payment letter on behalf of South Shore because he was advised by Hanover that unless he did so Hanover would not consent to the take-over arrangement that he had secured on South Shore's behalf with Rosciti Construction relative to the Pawtucket Project and Amtrak Project, respectively. *See Rosciti Affidavit at ¶22.*

Insofar as South Shore had no ability to continue in its business A. Rosciti ultimately petitioned South Shore into a Rhode Island Superior Court receivership proceeding in May, 2006. South Shore's default and inability to perform under its contracts resulted from

Hanover's direction to the owners of the Pawtucket Project and Amtrak Project, respectively, not to remit any further contract funds to South Shore, thereby resulting in South Shore's "flow of funds" relative to these projects being "cut-off" and South Shore being left with no ability to continue its business operations.

## Argument

1. Standard of Review

The critical inquiry for a court upon a motion for summary judgment is whether a genuine issue of material fact exists. "Material facts are those that might affect the outcome of the suit under the governing law." *Morrissey v. Boston Five Cents Savings Bank*, 54 F.3d 27, 31 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S, 242, 248 (1996)). "A dispute as to material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

On a motion for summary judgment, the court must view all evidence, and related inferences, in the light most favorable to the non-moving party. *See Springfield Terminal_Railway Company v. Canadian Pacific Limited*, 133 F.3d 103, 106 (1st Cir. 1997). "When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995). Similarly, "summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Electric Company*, 777 F.Supp. 167, 169 (D.R.I. 1991).

2. <u>Hanover's conduct created an event of default for South Shore, and thus, artificially triggered Hanover's claims under the Indemnification Agreement</u>

It is beyond dispute that on or about March 21, 2006, South Shore was not in default of any of its contractual obligations relative to either the Pawtucket Project or Amtrak Project, respectively. Moreover, at the same time, South Shore was in the process of faithfully discharging its scope of work and completing the same pursuant to its contracts with the project owners.

Further, on or about March 21st, Hanover was apprised that South Shore reached agreement as to settlement terms with G. Donaldson relative to G. Donaldson's disputed claim. Finally, at the same time, Hanover was aware of South Shore's good faith position with respect to its dispute of the so-called Vellano Bros. claim.

Notwithstanding, however, and despite there being no defaults under the project contracts, or the Indemnity Agreement as of March 21, 2006, Hanover took it upon itself to communicate directly with the project owners for the Pawtucket Project and the Amtrak Project, respectively, even though it did not have any direct contractual relationship with either, and instructed both to not release any further contract funds to South Shore absent Hanover's express consent, which said consent never came.

Indeed, all Hanover's actions did was create an event of default for South Shore with respect to its contracts with the project owners for the Pawtucket Project and Amtrak Projects, respectively, where one otherwise did not exist. Further, Hanover's precipitous action triggered a default under the Indemnity Agreement prematurely. In fact, at or about the time that Hanover communicated directly with the project owners for the Pawtucket Project and Amtrak Project,

respectively, Hanover was in the process of communicating with South Shore's representatives in order to address what it perceived may be certain issues and/or concerns relative to the subject projects, payment of subcontractors, and the completion of South Shore's contractual obligations. Notwithstanding, however, before South Shore even had an opportunity to respond to Hanover's inquiries, Hanover gratuitously forced itself upon the subject project owners, all to the detriment of, among others, the Roscitis.

Similarly, less than two (2) full business days after Hanover purported to make demand upon the individual indemnitors that they post additional collateral, Hanover, without giving reasonable opportunity to the indemnitors to consider and act upon Hanover's request, contacted the project owners directly for the Pawtucket Project and Amtrak Project respectively.

Simply put, neither South Shore nor the indemnitors had a "fighting chance" in light of Hanover's overreaching, overly aggressive and precipitous action. As a result of the same, all Hanover ultimately accomplished was creating a default for South Shore, and the individual indemnitors. Also, South Shore was rendered unable to consummate its settlement with G. Donaldson. Even more, Hanover's conduct leveraged eventual acknowledgements of voluntary default from the indemnitors, and a letter of direction of payment from South Shore.

It is beyond dispute that Hanover's action was in spite of its full knowledge of the attendant facts and circumstances, as well as at variance with its established course of conduct in dealing with South Shore up to that point in the parties' relationship. As a result of Hanover's conduct, the indemnitors have been placed at a significant disadvantage and irreparably harmed, and, as such, Hanover should not be rewarded for the same.

Thus, the Roscitis' Counterclaim should be permitted to be presented to a finder of fact for determination as to whether they have legitimate set-offs against Hanover's indemnification claims in light of Hanover's actions

## Conclusion

WHEREFORE, for the foregoing reasons, the Roscitis respectfully pray that this Court deny Hanover's motion for summary judgment, that this Court assign Hanover's Complaint and the Roscitis' Counterclaim, respectively, and the claims set forth therein for trial, and that this Court award to the Roscitis such other further relief as this Court may deem fair, just and reasonable.

Respectfully submitted,

Anthony F. Rosciti, Jr. &
Shannon B. Rosciti

By their Attorneys,

/s/ Christopher M. Mulhearn
Christopher M. Mulhearn (#5188)
**Ferrucci Russo, P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel: (401) 455-1000
Fax: (401) 455-7778
Email: cmulhearn@frlawri.com

Dated: July 23, 2008

**CERTIFICATION**

I hereby certify that on this 23rd day of July, 2008, the foregoing was served upon **Ronald E. Ritland, Esq.,** via e-mail @ rritland@peabodyarnold.com; **Kevin C. Cain, Esq.**, via e-mail @ kcain@peabodyarnold.com; **Joseph DeAngelis, Esq.,** via e-mail @ jdeangelis@apslaw.com; and **John P. Connelly, Esq.**, via e-mail @ jconnelly@peabodyarnold.com.

/s/ Christopher M. Mulhearn